ESTATE OF ALMA W. MITCHELL, B. G. MITCHELL, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Mitchell v. Commissioner
Docket No. 8004-80.
United States Tax Court
T.C. Memo 1982-185; 1982 Tax Ct. Memo LEXIS 561; 43 T.C.M. (CCH) 1034; T.C.M. (RIA) 82185; April 12, 1982. William H. Lawson, Jr. and John Andre Chiapella, for the petitioner. Vallie C. Brooks, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined a deficiency of $ 289,004.60 in the Federal estate tax of the Estate of Alma W. Mitchell. After concessions, the issue for decision is whether certain property is includible in Alma W. Mitchell's gross estate under either section 2035 or section 2033. [1]
Petitioner B. G. Mitchell is the executor of the Estate of Alma W. Mitchell and resided in Millington, Tenn., when the petition herein was filed. FINDINGS OF FACT Some facts have been stipulated and are found accordingly. Alma W. Mitchell (decedent) died on June 7, 1976, when she was 74 years old. She was the widow of H. S. Mitchell who died on October 23, 1972. In his last will and testament, H. S. Mitchell directed a portion of his estate, *563 equal to one-half its value as determined for Federal estate tax purposes, be set aside as a marital trust for decedent. The trustee of the marital trust was B. G. Mitchell, decedent and H. S. Mitchell's son and the executor of both their estates. Decedent was entitled to the trust income for life with distribution to be made at least quarterly. At decedent's death, the trust corpus was to pass per her power of appointment or, if no appointment was made, to her and H. S. Mitchell's three children in equal shares. A marital deduction of $ 377,477 was allowed to the Estate of H. S. Mitchell with respect to the marital trust. However, that trust was never funded. In addition to the marital trust interest decedent received pursuant to H. S. Mitchell's will, she became the owner of other property upon H. S. Mitchell's death by virtue of her position as a tenant by the entirety. Included within those properties were the Peter Fyfe Farm, the Rice property, real property at 5092 Third, the Martin Road and Navy Road property, and the Cuba-Millington Road property. The remainder of H. S. Mitchell's estate was bequeathed to his and decedent's three children in equal shares. B. G. Mitchell *564 arranged for the sale of the Peter Fyfe Farm, a portion of the Rice property, and the real property at 5092 Third. Although the proceeds of such sales, totaling well over $ 250,000, rightfully belonged to decedent, they remained with the Estate of H. S. Mitchell. Thus, an account receivable was due decedent from her late husband's estate. The lack of funding of the marital trust and the retention of the sales proceeds were based on B. G. Mitchell's belief that the funds were necessary to continue various farming and rental businesses. Decedent knew what was going on and acquiesced in it. In addition to the continuation of existing ventures, B. G. Mitchell decided to build a golf course development. He envisaged large profits from future sales of land near the golf course. Using a second mortgage on the estate's property and on his own property, B. G. Mitchell established a one million dollar line of credit with the Production Credit Association for the golf course development. At the time of trial, the golf course, a swimming pool, a club house, and tennis courts had been built. When H. S. Mitchell died in 1972, he had not lived with decedent for over twenty years. Rather, *565 decedent lived in a modest home next to her daughter. However, H. S. Mitchell did support decedent. She received a monthly allotment, her utility and household bills were paid, and she occasionally requested and received small additional amounts. Although decedent was entitled to a large inheritance upon H. S. Mitchell's death, her situation did not change. A ledger account was established on the H. S. Mitchell Estate books to reflect the small payments made to or on the behalf of decedent. When she died in 1976, the total balance in decedent's checking and savings accounts at Peoples State Bank was approximately $ 1,400. Sometime in the 1950's, decedent was diagnosed as having cancer in the vaginal wall. As a result, she went through a massive operation including a perineal colostomy. Subsequently, decedent suffered recurrent bouts of urinary infections, and periodically underwent home and office-visit treatment. In May 1974, decedent sustained a perforation of the colon which necessitated surgery. Decedent was hospitalized longer than normal because of a secondary infection. In early 1975, decedent suffered conjestive heart failure and was treated by mediation. On January 19, 1975, decedent *566 was hospitalized with a painful urinary tract infection. She was released on January 27, 1975. She reentered the hospital on February 27, 1975, with acute pyuria and gross hematuria--urinary tract infections. She was released on March 6, 1975. On September 26, 1975, decedent was hospitalized again for heavy pyuria, and remained in the hospital until October 5, 1975. Decedent's final hospital visit was from April 10, 1976, until May 26, 1976. During that visit, her doctors discovered a recurrence of cancer. However, she was sent home to rest before treatment for the cancer. When she went home, decedent was bedridden. Decedent died on June 7, 1976. On the death certificate, the immediate cause of death was listed as pulmonary embolism due to or as a consequence of pelvic cancer of uncertain cause. A pulmonary embolism is a blood clot which dislodges somewhere in the bloodstream and travels to the lung. It is common for the victim of a pulmonary embolism to have been bedridden. Three doctors who had treated decedent testified as to her life expectancy following her last hospitalization. One calculated it to be "a year or so," one estimated a normal life expectancy with respect *567 to the cancer but was unaware of the heart condition, and the third opined that it was a reasonable possibility decedent could have survived one year or more. On May 27, 1976, about two weeks before her death, decedent executed an Annuity Agreement with her three children--B. G. Mitchell, Alma Jean Williams, and Mary Jane Query. Pursuant to that Annuity Agreement, decedent agreed to transfer to her children (1) her interest in the marital trust created under H. S. Mitchell's will, (2) the account receivable due her from H. S. Mitchell's estate representing proceeds from the sale of properties owned by her by reason of tenancies by the entirety with H. S. Mitchell, and (3) the Martin Road - Navy Road and the Cuba-Millington Road properties. The children promised to pay decedent $ 10,732 per month for her life. Decedent died before any payments were made. The properties to be transferred by decedent under the Annuity Agreement were assigned the following values: Marital trust interest
[2] $ 377,477.00
Account receivable
[3] 296,844.31
Real properties
220,514.00
$ 894,835.31
*568 Calculated under section 20.2031-10(b)(2), Estate Tax Regs., the fair market value of the promise to pay decedent $ 10,732 per month for life was $ 894,854. [4] On the same day the Annuity Agreement was executed, decedent executed, in favor of her children, assignments of her marital trust and account receivable interests and quit claim deeds to the real properties. The execution of all the subject documents took place in decedent's home at her bedside. When his father died, B. G. Mitchell was practicing medicine as an orthopeadic surgeon, but gradually gave up his active practice to manage his late father's estate and business, including farming and rental real estate. According to an unaudited balance sheet prepared by his accountant, B. G. Mitchell had assets totaling $ 1,208,563 on January 31, 1977, with notes and mortgages payable of $ 159,240. His situation was substantially the same in June 1976. An examination *569 of B. G. Mitchell's Federal income tax returns for 1976 and 1977 reveal that income exceeded deductible expenses (excluding depreciation) by less than $ 20,000 in each of those years. Of course, those calculations do not take into account any nontaxable sources of income, nondeductible expenditures, and capital expenditures. Neither of decedent's daughters was in a position of great wealth. Mary Jane Query's Federal income tax returns reveal only about $ 5,000 and $ 9,000 of income over deductible expenses (excluding depreciation) in 1976 and 1977, respectively. Of course, such does not reflect nontaxable income sources, nondeductible expenditures, and capital expenditures. However, her real estate holdings were sizeable. Alma Jean William's 1977 Federal income tax return reveals about $ 10,000 in available funds without taking into account nontaxable income sources, nondeductible expenditures, and capital expenditures. She retired from a civil position at the Millington Naval Air Base in 1977 with only one sizeable asset--her home worth $ 50,000. In the spring of 1976, B. G. Mitchell contacted Robert H. Humphreys, the Associate Division Manager and Director of Farm Services *570 with the Equitable Life Insurance Society Mortgage and Realty Department. Mr. Humphreys had made loans to B. G. Mitchell and H. S. Mitchell in the past and was familiar with the overall financial picture of the family. B. G. Mitchell inquired about borrowing "a little money," but was vague about why the loan was needed. In April 1976, B. G. Mitchell approached John Douglas of the Peoples State Bank about a possible loan to B. G. Mitchell and his sisters. B. G. Mitchell stated the purpose of the loan was "to buy some property from their mother" at $ 10,000 per month. Mr. Douglas agreed to loan the money for about three to six months. No collateral was requested; nor was further approval sought since Mr. Douglas had authority to loan up to $ 60,000 on his own. B. G. Mitchell had a line of credit with the Production Credit Association which primarily finances farming operations. Basically, funds from that source were used for a golf course development. See pp. 3-4, supra.
In his statutory notice of deficiency, respondent determined the property worth $ 894,835 transferred by decedent to her children on May 27, 1976, is includible in decedent's gross estate pursuant *571 to section 2035. In his amended answer, respondent determined section 2033 also applies.
OPINION The issue before us is whether the property (the marital trust interest, the account receivable, and the real properties) transferred by decedent to her three children is included in her gross estate. Respondent maintains section 2035 mandates inclusion because the transfer was made in contemplation of death and there was no bona fide sale for adequate and full consideration. Alternatively, respondent argues the transfer was void under state law, and section 2033 causes inclusion. Petitioner contends neither section 2035 nor section 2033 is applicable because the transferred property was sold for adequate and full consideration. We agree with respondent that the transferred property is included in decedent's gross estate under section 2035. [5]
*572 Section 2035 includes in a decedent's gross estate any property transferred by the decedent in contemplation of death unless there was a bona fide sale for adequate and full consideration. [6] The parties disagree as to both elements--whether there was a bona fide sale and, if not, whether the transfer was made in contemplation of death. Petitioner contends decedent received a life annuity from her children in exchange for transferring the property, and the value of that annuity exceeds the date-of-transfer vaule of the property. The value of the annuity was calculated under section 20.2031-10(b)(2), Estate Tax Regs. While petitioner went to great lengths at trial to show that decedent's date of transfer health was sufficiently good to prevent going outside the valuation tables, respondent does not challenge the table valuation. Rather, respondent maintains there was no bona fide sale and the value of the consideration which would have been paid had the sale been bona fide is irrelevant. We agree. *573 Absent an actual intent to pay, stated consideration cannot elevate a gratuitous transfer to a bona fide sale. We are unable to find decedent's three children actually intended to pay decedent for the transferred property through the stated annuity method or any other method. Principally, three factors lead us to our conclusion that there was never an intent to pay decedent the stated consideration: (1) decedent's financial arrangements prior to the transfer, (2) the apparent inability of the children to pay decedent over $ 10,000 per month, and (3) decedent's health at the time of the transfer. When H. S. Mitchell died, decedent became the income beneficiary for life of a trust valued at over $ 350,000. However, the trust was never funded and, basically, decedent never saw her inheritance. Rather, her daily financial picture remained much the same as it was before H. S. Mitchell died. Her modest monthly bills were paid and she received small additional amounts upon request. Nor did she materially benefit from the real properties which became hers by operation of law upon H. S. Mitchell's death. While some of those properties *574 were sold after H. S. Mitchell died, decedent really never benefited from the sales proceeds. B. G. Mitchell explained all this was necessary because the various monies were needed to operate the family businesses and to help finance the golf course development. He further explained decedent knew what was going on and approved it. Just as decedent's day-to-day financial situation did not change after H. S. Mitchell died, we are convinced it would not have changed after the transfer had she lived longer. According to B. G. Mitchell, decedent understood and accepted his representation that the available monies were needed for business. We cannot envisage her expecting more money becoming available for distribution to her upon the transfer of her property. Apparently, available monies would still be devoted to business. Nor are we able to find the three children had the personal resources to support seriously their promise to pay decedent over $ 10,000 per month for her life. While according to an unaudited balance sheet B. G. Mitchell had over one million dollars in assets, his own testimony points to the fact that his assets were for the most part committed to the family *575 businesses and the golf course project. His 1976 and 1977 Federal income tax returns reveal little annual income which might be available for payments to decedent, while those of his sisters reveal similar or even lesser amounts. While those returns do not disclose any nontaxable income, petitioner has brought none to our attention, and he bears the burden of proof. Rule 142(a). Petitioner alleges the monthly payments could have been paid with borrowed funds for which arrangements had been made. Three borrowing sources were identified--the Equitable Life Insurance Society Mortgage and Realty Department, the Peoples State Bank, and the Production Credit Association. With respect to the Equitable Mortgage and Realty Department and the Production Credit Association, petitioner has shown us nothing. An Equitable representative merely related that B. G. Mitchell inquired about borrowing "a little money" for some vague reason, and it appears the Production Credit Association, which primarily finances farming operations, was advancing funds for the golf course development. We view neither of those as sources for the significant amounts necessarily were the annuity promise actually *576 carried to fruition. As to the Peoples State Bank, there does exist a direct tie to the annuity promise. In April 1976, B. G. Mitchell obtained an oral commitment that Peoples would loan the needed $ 10,000 per month for three to six months. To that extent, perhaps funding was obtainable for a short segment of the annuity promise. However, we have no proof that any further, long-term financing was possible. In reality, we believe decedent's children never expected any long-term financing was necessary. When decedent transferred her property and received the annuity promise, she was bedridden and quite ill. We see no reason to reiterate in detail our findings of fact concerning her medical history and condition. They speak for themselves. While perhaps decedent's medical condition was not so poor as to render the actuarial tables inapplicable to her, [7] we are convinced such condition casts a serious doubt on the children's assertions that they expected actually to pay decedent the fair market value of the transferred property in her lifetime. We find incredible the children's testimony that they would have even considered approving decedent's entering into a similar arrangement *577 with anyone else. We emphasize we are not holding that decedent's poor health makes the actuarial tables inapplicable or by itself would necessarily evidence an intent not to pay. However, when combined with the other facts in this case we simply do not believe the children ever intended to pay decedent any significant amount. Absent such an intent, no bona fide sale occurred, and decedent's transfer was gratuitous. [8]
Even though decedent gratuitously transferred the property, section 2035 only applies if such transfer was made in contemplation of death. Decedent's transfer was made within three years of her death, and section 2035(b) provides such a transfer is "deemed to have been made *578 in contemplation of death" unless a showing is made to the contrary.Petitioner has made no such showing. Petitioner contends decedent transferred the property for two reasons unassociated with her death: (1) to insure herself a steady flow of income, and (2) to relieve herself of management problems. We do not believe either reason motivated the transfer. We have already found there was no intent to pay decedent and are convinced she expected no more than what she was receiving before the transfer. As to relieving herself of management problems, there is no evidence before us that she ever had any. On the contrary, it appears that after H. S. Mitchell's death, B. G. Mitchell ran everything. Perhaps he managed with decedent's acquiescence, but we are unconvinced he did it with her active participation. Moreover, both decedent's poor health and the underlying estate tax avoidance benefits to be derived, point to a death, rather than a life, motive. See section 20.2035-1(c), Estate Tax Regs. In summary, we find petitioner gratuitously transferred the marital trust interest, the account receivable, and the real properties in contemplation of death. Thus, those transferred *579 properties are included in her gross estate under section 2035. [9]
To reflect the foregoing and a resulting computation, [10]
Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise provided, all section references are to the Internal Revenue Code of 1954, as amended, and in effect at the date of decedent's death. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The $ 377,477 equals the amount allowed the H. S. Mitchell estate as a marital deduction with respect to the trust. ↩
3. The correct account receivable was $ 350,957.43 when the Annuity Agreement was executed. The parties agree the excess of the correct value over the assigned value is included in decedent's gross estate.↩
4. Paying $ 10,732 per month would result in $ 128,784 per year. That yearly amount is multiplied by the applicable factor for a 74 year old female and by the adjustment factor for monthly payments. See sec. 20.2031-10(b)(2), Table A(2), Estate Tax Regs.↩
5. We recognize technically sec. 2035 includes the value of property in the value of the gross estate. However, for convenience we shall refer to the property being included in the gross estate. There is no dispute herein as to the value↩ to be included if inclusion is mandated.
6. We stress we are dealing with sec. 2035↩ as it was in effect when decedent died.
7. See generally Continental Ill. Nat. B. & T. Co. of Chicago v. United States,504 F.2d 586 (7th Cir. 1974); Estate of Jennings v. Commissioner,10 T.C. 323 (1948); Rev. Rul. 80-80, 1980-1 C.B. 194↩.
8. To the extent any amount had been paid, it seems a reduction in the amount included in decedent's gross estate would follow under sec. 2043.↩
9. Given our holdings, supra, we need not address respondent's contention that sec. 2033↩ applies because the transfer was void under state law.
10. With respect to the gratuitous transfer respondent concedes decedent's estate is entitled to a sec. 2012 credit for gift tax even though the gift tax is paid after decedent's death and is deductible from decedent's gross estate as a debt of decedent. See sec. 20.2012-1, Estate Tax Regs. The actual computations are a proper subject for proceedings under Rule 155.↩